UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Nanette Cornado Escobar,<br><br>                         Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin,<br><br>                        Defendant. | Case No.:  14cv02741-LAB (BGS)<br><br>**Report and Recommendation** |

## I.   INTRODUCTION

On December 26, 2012, Nanette Cornado Escobar ("Plaintiff") filed an application for Supplemental Security Income ("SSI") alleging disability beginning January 1, 2004 due to bipolar, seizures, Duane Syndrome, manic depression, insomnia, and memory loss. (ECF Nos. 16-18, Administrative Record "AR" 65-66.)  Her claim was initially denied on March 15, 2013, and upon reconsideration on May 10, 2013.  (*Id.* at 66-79, 80-96.)  After a hearing on April 21, 2014 (*id.* at 40-64), Administrative Law Judge ("ALJ") Peter J. Baum issued a decision denying the application on June 6, 2014.  (*Id.* at 24-33.)

On September 15, 2014, the Appeals Council denied review, making the ALJ's decision the final agency decision.  (*Id.* at 1-4.)  This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g), 1383(c).  Plaintiff filed her Motion for Summary Judgment on September 10, 2015, (ECF No. 21) and Defendants filed their cross Motion for Summary

1

Judgment on October 8, 2015.  (ECF No. 22.)

## II.  LEGAL STANDARDS FOR DETERMINATION OF DISABILITY

In order to qualify for disability benefits, an applicant must show that: (1) he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than twelve months; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  *Id.*  The applicant has the burden to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

The Secretary of the Social Security Administration set forth a five-step sequential evaluation process for determining whether a person has established his or her eligibility for disability benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The five steps in the process are as follows:

1. Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520C, 416.920C.

3. Does the impairment "meet or equal" one or more of the specific impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1?  If so, then the claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

2

1 | *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

2 |      The claimant bears the burden of proof during steps one through four. *Id.* at 953.

3 | The Commissioner bears the burden of proof at step five of the process, where the

4 | Commissioner must show the claimant can perform other work that exists in significant

5 | numbers in the national economy, "taking into consideration the claimant's residual

6 | functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d

7 | 1094, 1100 (9th Cir. 1999); *see also* 20 C.F.R. § 404.1566 (describing "work which

8 | exists in the national economy"). If the Commissioner fails to meet this burden, then the

9 | claimant is disabled. If, however, the Commissioner proves that the claimant is able to

10 | perform other work that exists in significant numbers in the national economy, then the

11 | claimant is not disabled. *Bustamante*, 262 F.3d at 953-54.

12 | ### III.    BACKGROUND

13 | **A. Relevant Medical Records**

14 |     **a.  Examining Consultative Physician Opinion Evidence**

15 |         **i.  Dr. Rosa**

16 |      Plaintiff underwent a psychological consultive examination on February 23, 2013,

17 | performed by Colonna Rosa, Ph.D, a clinical psychologist. (AR 588) Dr. Rosa

18 | performed a complete psychological evaluation, a "trail making test, parts A and B," the

19 | "Wechsler Adult Intelligence Scale – Fourth Edition, Wechsler Memory Scale – Fourth

20 | Edition, and Remote Area Adjustment Fee Medical Only. (*Id.*)

21 |      Dr. Rosa noted that Plaintiff stated she was applying for disability benefits "to

22 | regulate her life and health condition." (*Id.*) Plaintiff indicated that she was diagnosed

23 | with Bipolar Disorder following her divorce in 2008, when her seizures started. (*Id.*)

24 | Plaintiff described short term memory loss due to her seizures. (*Id.*) Plaintiff also

25 | reported numerous emotional breakdowns and psychiatric hospitalizations due to an

26 | apparent cycle of self-destruction and suicidal thoughts. (*Id.*)

27 |      Dr. Rosa noted that Plaintiff's medical history includes numerous psychiatric

28 | hospitalizations, most of which occurred in San Diego from 2006 to 2012. (*Id.*) Plaintiff

reported that her psychiatric medication is not helpful, so she sometimes self-medicates with alcohol.  (*Id.*; *see also id.* at 591.)

According to Dr. Rosa, Plaintiff was "quite oriented" to person, place and purpose of the examination and her thoughts were organized and linear.  (*Id.* at 591.)  Dr. Rosa opined that the Plaintiff's intellectual functioning was in the low average range, although scores upon psychometric testing fell within the borderline range.  (*Id.*)

Plaintiff's memory was moderately diminished for immediate, intermediate and remote recall, per testing, but appeared generally intact for immediate, intermittent and remote recall.  (*Id.* at 592.)  Test results indicated that Plaintiff's attention and concentration were mildly diminished.  (*Id.*)  Plaintiff's insight and judgment were grossly age appropriate and she responded appropriately to imaginary situations requiring social judgment.  (*Id.*)

Dr. Rosa opined that the results of Plaintiff's intellectual functioning testing were an underestimation of Plaintiff's ability because of the dichotomy between her ability to fill out a pre-printed questionnaire in detail and give the doctor a very elaborate history of her alleged mental illness.  (*Id.* at 593.)  She stated the probable diagnoses were as follows: alcohol abuse, bipolar disorder not otherwise specified, personality disorder dependent borderline histrionic traits, probably low average intellectual functioning.  (*Id.*)  As for general medical conditions, Dr. Rosa noted that she deferred to the medical specialists and listed obesity, Duane's Syndrome, seizure disorder, gall bladder removal, and cluster migraine headaches.  (*Id.*)  As for psychosocial stressors, Dr. Rosa noted "issues with primary support group, extensive mental health hospitalizations, financial concerns, characterological issues.  Moderate."  (*Id.*)  Dr. Rosa assigned Plaintiff a Global Assessment of Functioning ("GAF") of 59.[1]  (*Id.*)

---

[1] The Global Assessment of Functioning (GAF) score is a scale reflecting "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).  The GAF scale ranges from 1 to 100 and is used by clinicians to indicate his or her overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association.  American

Dr. Rosa concluded that Plaintiff could understand, remember and carry out short, simplistic instructions without difficulty, but had a mild inability to do the same with detailed instructions.  (*Id.* at 594.)  She further concluded that Plaintiff would be able to make simplistic work-related decisions without special supervision.  (*Id.*)  Dr. Rosa noted that Plaintiff would likely have a moderate inability to take directions from supervisors and get along with coworkers on a sustained basis due to her history of failure with workplace and personal relationships.  (*Id.*)  Dr. Rosa concluded that Plaintiff would have a moderate inability to maintain adequate concentration and pace during an eight hour workday.  (*Id.*)  Dr. Rosa predicted that Plaintiff would be prone to episodes of emotional deterioration for stress encountered in the workplace because of manic mood swings and periodic worsening and would have a moderate inability to deal with exchanges in the workplace.  (*Id.*)  Dr. Rosa noted that Plaintiff would have a moderate inability to carry out simple or complex instructions on a sustained basis.  (*Id.*)  As part of her report, Dr. Rosa recommended Plaintiff adopt a sober lifestyle in conjunction with medication and therapy.  (*Id.*)

### ii.  Dr. Bagner

Plaintiff also underwent a psychiatric consultive examination by Ernest Bagner III,

_____

Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM-IV-TR*).  A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work, school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family and is unable to work[.])."  A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.*  A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficultly in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*  It should be noted that the Ninth Circuit has observed that "[t]he Commissioner has determined the GAF scale "does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings."  65 Fed. Reg. 50, 746, 50, 765 (Aug. 21, 2000)."  *McFarland v. Astrue*, 288 Fed.Appx. 357, 359 (9th Cir. 2008)(unpub.).  In fact, GAF scoring has been removed from the DSM V for "lack of conceptual clarity."  *Phillips v. Colvin*, 61 F.Supp.3d 925, 931 n.2 (N.D. Cal. 2014).

M.D., Board Eligible Psychiatrist on February 23, 2013. (*Id.* at 596.) Plaintiff reported having manic depression, insomnia, memory loss due to seizures, and feelings of helplessness and hopelessness. (*Id.*) She reported seeing a psychiatrist and taking her medications. (*Id.*) She reported drinking alcohol daily, but denied suicidal ideations. (*Id.*)

After an evaluation, Dr. Bagner opined that Plaintiff suffered from a schizoaffective disorder-bipolar type and alcohol dependence. (*Id.* at 598.) He deferred diagnosing medical conditions and personality disorders, stated that Plaintiff had occupational, economic and health problems and assigned Plaintiff a GAF of 60. (*Id.*)

He concluded that Plaintiff would have no limitation in her ability to follow simple oral and written instructions. (*Id.*) According to Dr. Bagner, Plaintiff's ability to interact appropriately with the public, co-workers and supervisors was mildly limited, but her ability to respond to changes in a routine work setting was moderately limited. (*Id.*) He concluded that Plaintiff's ability to comply with job rules such as safety and attendance was mildly limited. (*Id.*) Plaintiff's ability to respond to changes in routine work setting was moderately limited. (*Id.*) Plaintiff's ability to respond to work pressure in a usual work setting was moderately limited, as were her daily activities. (*Id.*) Dr. Bagner concluded that Plaintiff's prognosis was fair with continued psychiatric treatment and alcohol rehabilitation. (*Id.*)

### b. Non-Examining Consultive Psychiatrist Opinion Evidence

#### i. Dr. S. Khan, M.D.

Dr. Khan is a state agency medical consultant who reviewed the medical evidence of record and concluded that Plaintiff's conditions were not disabling. (*Id.* at 89, 90, 96.) He reviewed the disability determination based on Plaintiff's assertion that, as of March 19, 2013, "[d]ue to a stressful situation [she] was placed under while speaking to [her] examiner and examiner's supervisor with Social Security, [her] feelings of worthlessness sent [her] to seek psychiatric help for [her] suicidal tendencies." (*Id.* at 82.) Plaintiff submitted medical records from McKay Dee Hospital as reconsideration evidence. (*Id.* at

82-83.)  Dr. Khan also reviewed medical evidence previously submitted.  (*See id.* at 83-87.)  Dr. Khan reviewed the notes from the examining consultive psychiatrists and stated that he "reviewed all the evidence in the file including additional evidence if any, since last denial for this 39 year old female claimant.  I agree with the initial decision (NPSRTs) and in the absence of any new objective evidence to suggest a change (worsening) or claimant's psychiatric condition / measures of adaptive functioning would affirm the initial decision as written."  (*Id.* at 88-89; *Id.* at 90.)

### c.  Medical Record Evidence

Plaintiff's hospital stays between 2012 and 2014 are numerous and take place both in Utah and California among six different facilities.  The Court has attempted to synthesize the record of those hospital stays for the purpose of providing context to its analysis of the issues.  This summary, however, does not purport to be exhaustive of every detailed contained in the voluminous 2,200 page record.

### i.  Hospital Visits in 2012

Plaintiff was admitted to CRF Halcyon Center in El Cajon, California for "severe mood disturbance (depression, feelings of worthlessness, shame and guilt, anxiety, racing thoughts, poor focus and concentration) and risk of decompensation without continued treatment" on July 27, 2012 and discharged four days later on July 31, 2012.  (*Id.* at 942.)

### ii.  March, April and May of 2013

On March 19, 2013, Plaintiff admitted herself in McKay Dee Hospital in Ogden, Utah, due to "voices telling [her] to kill [her]self."  (*Id.* at 636.)  She was discharged on April 2, 2013, and noted to be "stable[,]" "both psychiatrically and medically."  (*Id.* at 655, 757.)  Hospital notes also state in pertinent part,

"Whenever discharge was discussed with the patient for her to start making arrangements, as we felt she was getting close to being stable, she would always try to sabotage discharge by asking for 1 more day to stay in the hospital, initially asking to stay in order to be able to address concerns in the context of her family not being supportive of her taking psychiatric medication.  The next day when we were planning to discharge her, she again tried to sabotage discharge by saying that she did not feel like she was stable on her medications . . . I myself saw the patient interacting with other

7

patients quite well, but whenever spoken to about discharge, she would become quite irritable and was quite resistant to leaving the hospital.  []  There were concerns for patient malingering by the time of discharge, given the fact that she tried to sabotage discharge so many times."  (*Id.* at 656-67.)

On May 25, 2013, Plaintiff was admitted to Pioneers Memorial Hospital in Brawley, California at 3:48 a.m., due to difficulty breathing and was discharged later that morning.  (*Id.* at 1106-07.)

### iii.  October, November and December of 2013

On October 12, 2013, Plaintiff presented to Davis Hospital and Medical Center in Layton, Utah with complaints of suicidal ideation (*id.* at 772, 782) and was discharged on October 18, 2013.  (*Id.* at 771.)  On October 19, 2013 she was admitted to McKay-Dee Hospital Center in Utah due to suicidal thoughts and auditory hallucinations (*id.* at 737-38) and was discharged on October 25, 2013.  (*Id.* at 737.)  Notes from her time at McKay-Dee Hospital state: "she could have motives for either exaggerating some of her symptoms or for staying in the hospital when further psychiatric hospitalization would not be helpful and may even foster a greater dependency need."  (*Id.* at 740.)

On November 8, 2013, Plaintiff was admitted to Pioneers Memorial Hospital in Brawley, California with complaints of a headache and "seizure aura" at 2:42 p.m., and was discharged later that day.  (*Id.* at 1089-90.)

On November 10, 2013, Plaintiff was again admitted to Pioneer Memorial Hospital because she felt like she was going to have a seizure (*id.* at 1064-65) and was low on her Dilantin.  (*Id.* at 1068.)  Hospital staff refilled her prescription and discharged her that same day.  (*Id.* at 1075.)

On November 14, 2013, Plaintiff was admitted to Pioneers Memorial Hospital complaining of a head injury sustained the day before as a result of a fall subsequent to a seizure.  (*Id.* at 1046, 2099.)  The report notes that she had not been taking her Dilantin for several months.  (*Id.* at 1048.)  She was given Dilantin and discharged that day.  (*Id.*)

On November 25, 2013, Plaintiff reported to Sharp Grossmont Hospital in La

Mesa, California because she felt like she was going to have a seizure.  (*Id.* at 1286.)
Upon evaluation by a social worker, Plaintiff reported suicidal ideation.  (*Id.*)  The psych
liaison described Plaintiff as "manipulative," because she had been released from another
psychiatric facility earlier in the day.  (*Id.*)

On November 30, 2013, Plaintiff was again admitted to Sharp Grossmont Hospital
with complaints of depression and suicidal ideation as a result of her boyfriend's
infidelity.  (*Id.* at 1528-29, 1716.)  She was released on December 1, 2013.  (*Id.* at 1528.)
She was then admitted to Sharp Grossmont Behavioral Health on December 1, 2013, for
the same suicidal thoughts and discharged on December 10, 2013.  (*Id.* at 1676.)

Plaintiff underwent an adult intake assessment at Imperial County Behavioral
Health on December 16, 2013, where she reported mood swings, insomnia, panic attacks,
bipolar disorder, depression and suicidal ideation and attempts.  (*Id.* at 2165.)  The intake
form indicates that Plaintiff was referred for medication support assessment and for
therapy.  (*Id.* at 2168.)

As a result of the therapy referral, Plaintiff presented to Imperial County
Behavioral Health Services in El Centro, California on December 20, 2013 for an initial
nursing assessment.  (*Id.* at 2164.)  A progress report from staff member Kay Caudillo
from that visit states that Plaintiff reported feelings of depression, daily anxiety, panic
attacks, mood swings, irritability and paranoia.

Plaintiff was admitted to Pioneers Memorial Hospital in Utah on December 28,
2013, because she felt she was going to have a seizure.  (*Id.* at 2034.)

### i.  January and February of 2014

On January 7, 2014, Plaintiff was seen by Rakosh Kumar Bhansali M.D. at
Imperial County Behavioral Health Services in El Centro, California for a follow-up
appointment.  (*Id.* at 2162.)  A mental status exam was conducted.  (*Id.* at 2162.)
Plaintiff reported having a stable mood, and that her anxiety was under control.  (*Id.*)  She
reported sleeping well, and denied suicidal thoughts.  (*Id.*)  Notes from that visit also
indicate that Plaintiff denied symptoms suggestive of mania, depression or psychosis.

1   (*Id.*)  Dr. Bhansali's notes from that visit state that he need to obtain "records from
2   previous provider to verify diagnosis and her medications."  (*Id.*)  He also notes that he
3   "discussed risk and benefit of recommended management, prognosis, importance of
4   compliance with treatment recommendation," and that "patient was given information
5   about current psychiatric conditions, alternative treatment options, risk and complication
6   of not treating current conditions."  (*Id.*)  A follow up appointment was scheduled for
7   four weeks later.  (*Id.*)

8        On January 22, 2014, Plaintiff called Imperial County Behavioral Health Services.
9   (*Id.* at 2160.)  A staff member completed a progress report, noting that Plaintiff reported
10  having a seizure on January 12, 2014, during which she hit her mouth and broke two
11  teeth.  (*Id.*)  Plaintiff stated that she is "not doing so well with medication support and
12  symptoms."  (*Id.*)  Plaintiff also stated that she lost her Xanax and requested Dr. Bhansali
13  authorize a refill before the next refill date.  (*Id.*)  Dr. Bhansali would not refill the
14  medication without seeing Plaintiff first, but agreed to prescribe gabapentin 300mg.  (*Id.*;
15  *see also id.* at 2161.)

16       Plaintiff was seen by Dr. Bhansali at Imperial County Behavioral Health Services
17  on February 21, 2014.  (*Id.* at 2157.)  She reported that her stress induced seizures, mood
18  swings and depressed mood "has resolved," and denied being depressed.  (*Id.*)  Dr.
19  Bhansali conducted a mental status exam.  (*Id.*)  Dr. Bhansali lowered Plaintiff's dose of
20  Xanax to 5mg/day, with plans to continue lowering to the minimum effective dose.  (*Id.*
21  at 2158.)  Dr. Bhansali's notes from that visit state that he need to obtain "records from
22  previous provider and neurologist to verify diagnosis and her medications."  (*Id.*)  He also
23  states that he "discussed risk and benefit of recommended management, prognosis,
24  importance of compliance with treatment recommendation," and that "patient was given
25  information about current psychiatric conditions, alternative treatment options, risk and
26  complication of not treating current conditions."  (*Id.*)  The doctor's notes also indicate
27  that he received lab results, which indicated abnormal lipids, and that he reviewed those
28  results with Plaintiff.  (*Id.*)  A follow up appointment was scheduled for eight weeks later.

(*Id.*)

## ii.  March and April of 2014

Plaintiff was admitted to Pioneers Memorial Hospital in Utah on March 27, 2014, complaining of a head injury as a result of a seizure she experienced the day before, and discharged later that day.  (*Id.* at 2066.)  On April 15, 2014, Plaintiff saw Dr. Bhansali at Imperial County Behavioral Health Services in El Centro, California.  (*Id.* at 2153.) Notes from a patient progress report from that day state that Plaintiff "is worried because she is going to court for child support" and has "anxiety daily," (*id.*), but reported no feelings of depression, no mood swings, and consistent sleep.  (*Id.* at 2153-54.)  Dr. Bhansali decreased Plaintiff's Seroquel dosage to 200mgs, with other medications to continue as prescribed.  (*Id.* at 2154.)  Dr. Bhansali's notes from that visit state that he need to obtain "records from previous provider and neurologist to verify diagnosis and her medications."  (*Id.*)  He also notes that he "discussed risk and benefit of recommended management, prognosis, importance of compliance with treatment recommendation," and that "patient was given information about current psychiatric conditions, alternative treatment options, risk and complication of not treating current conditions."  (*Id.*)  A follow up appointment was scheduled for eight weeks later.  (*Id.*)

## B. Hearing Testimony

### a.  Plaintiff's Testimony

Plaintiff testified that she had not worked since 2012, nor had she looked for work since that time because of her insomnia, paranoia, and seizures.  (ECF No. 16-2 at 44.) When asked why she had not worked for anyone on more than a part time basis even before the seizures started seven years ago, Plaintiff responded that she had insomnia. (*Id.* at 61-62.)

During this period of unemployment, Plaintiff has been homeless and living on the beach, park benches, or with friends.  (*Id.* at 45.)  Plaintiff's symptoms started when she divorced her husband after learning of his infidelity.  (*Id.* at 47.)  Plaintiff has three daughters.  (*Id.* at 58.)  Her oldest daughter could not get along with her ex-husband, so

14cv02741-LAB (BGS)

she lives with Plaintiff at Plaintiff's mom's house.  (*Id.* at 58.)  The youngest and middle children live with their father, but are trying to live with plaintiff.  (*Id.* at 58.)

Plaintiff is the first person in her family to have a mental illness, so she has no support and is ridiculed.  (*Id.* at 54.)  Her family does not believe in medication or psychiatry (*id.*), so when she is on medication, she has to stay secluded from her family.  (*Id.* at 55.)  One time her mother took the medication Plaintiff received from Grossmont and flushed it down the drain.  (*Id.* at 54.)  She is allowed to go to her family's home to "get her stuff together" or take a shower.  (*Id.* at 46.)  She has tried to take her life multiple times because she has no support from her family and living with her condition is hard.  (*Id.* at 50.)

Plaintiff testified that she is currently taking her prescription Dilantin.  (*Id.* at 46, 47.)  When asked why her test results from hospital stays indicate a subtherapeutic level of Dilantin, Plaintiff explained that she did not have insurance (*id.*) and could not afford her medication.  (*Id.* at 48.)  Plaintiff became insured by Molina on January 1, 2014, and has since been taking her medication regularly.  (*Id.* at 47-48.)

Plaintiff originally testified that she had not consumed any alcohol since 2012.  (*Id.*)  When the ALJ asked why her medical records from Scripps Hospital said she was drinking 2 liters of vodka, she clarified that she had not been drinking since January of 2014.  (*Id.* at 48-51.)  Before she stopped drinking, Plaintiff drank about two glasses of whiskey "to numb" because she wanted to jump off a bridge.  (*Id.* at 51-52.)  When she was in San Diego, she had no way to cope and had no money for medication, which she acknowledged was not a good excuse for drinking.  (*Id.* at 48-49.)

Plaintiff testified that she hears voices once or twice a month telling her to jump off a bridge and end it (*id.* at 52) or that she is worthless and life is "not worth it."  (*Id.* at 53.)  She wanted to jump off a bridge because the voices told her to, and because her boyfriend had cheated on her and she "can't take rejection."  (*Id.* at 58-59.)  She uses Seroquel to calm the voices, but she still hears them.  (*Id.* at 52-53.)  When she hears the voices, she isolates herself.  (*Id.* at 53.)  She has anxiety attacks when she is around a lot

of people and feels like she is going to have a heart attack—her muscles feel tight, she has a nauseated stomach, and her head feels like compressed air.  (*Id.* at 53-54.)

She feels depressed two or three times a month, and each time her depression lasts a couple of weeks.  (*Id.* at 54.)  She is taking Prozac, which has "been doing wonders," but it does not take the depression completely away.  (*Id.* at 55.)  She feels violent, even though she does not consider herself a violent person.  (*Id.* at 55.)

She has battled insomnia for several years and gets an average of four or five hours of sleep over the course of the night.  (*Id.* at 56.)  She cannot read because she cannot concentrate due to hearing voices, but she watches TV.  (*Id.*)  When she does not hear the voices, she concentrates on going to bed.  (*Id.*)  There are times when she is awake the whole night, and she is very "antsy" and is likely to have a seizure the next day.  (*Id.* at 57.)

She has about three seizures a month.  (*Id.* at 58.)  During the rest of the month, she has difficulty concentrating because she is always waiting for the next seizure to happen.  (*Id.* at 56-57.)  Before she loses consciousness during a seizure, she experiences pain at the end of her spinal cord, which feels like a pressure point or an adrenaline rush.  (*Id.* at 45.)  Plaintiff has been seeing Dr. Bhansali at Brawley Mental Health, who prescribed her benzodiazepine.  (*Id.* at 49.)  Plaintiff also has Blain Syndrome, which makes it so she cannot see out of her left eye.  (*Id.* at 58.)  Because of this and her seizures, she cannot get a license.  (*Id.* at 58.)

### b.  Testimony from the Vocational Expert

Kathleen McAlpine testified as a vocational expert.  (*Id.* at 60.)  The ALJ described plaintiff as 38 years old as of her filing date, who is now 40 years old.  (*Id.* at 62.)  The ALJ asked the VE to assume the following set of limitations for the purpose of the first hypothetical.  (*Id.* at 62.)

"The lady can sustain simple repetitive tasks.  She has a moderate limitation in her ability to deal with co-workers and the general public, and so therefore, she should have no more than as a necessary basis – no more than brief superficial and intermittent contact with either the general public, that includes customers, or

supervisors and fellow employees.  I'd like you to assume that she has no exertional limitation.  She can even climb ladders, ropes and scaffolds occasionally, but she should avoid even moderate exposure to hazardous machinery and unprotected heights."

Based on this set of limitations, the VE testified that there are jobs that exist in the national or California economy that Plaintiff could sustain.  (*Id.* at 62.)  One example would be janitor/cleaner, DOT 323.687-014, light, which is unskilled.  (*Id.* at 63.)  There are 131,136 jobs in the nation and 13,777 jobs in California.  (*Id.* at 63.)  Another example is stock clerk, DOT 922.687-058, which is medium, unskilled.  (*Id.* at 63.)  There are 94,582 jobs in the nation and 9,355 jobs in California.  (*Id.* at 63.)  The *Dictionary of Occupational Titles'* descriptions for those jobs are consistent with the limitations provided.  (*Id.* at 63.)

The ALJ then asked the VE to assume limitations as plaintiff described: "she hears voices one or two times a month throughout the day that cause her to isolate, but she says that she has seizures three times a month.  In addition, she's only sleeping four to five hours a night."  With those limitations, the VE testified that plaintiff could not sustain the above mentioned jobs, or any other jobs in the American economy.  (*Id.* at 63.)

## C. ALJ's Findings

On June 6, 2014, the ALJ issued his decision denying benefits and supplemental security income.  (*Id.* at 33.)  In reaching his decision, the ALJ applied the Commissioner's five-step sequential disability determination process set forth in 20 C.F.R. § 404.1520 and described above.  (*Id.* at 24-33.)  The ALJ agreed that Plaintiff did not engage in substantial gainful activity during the relevant period.  (*Id.* at 26.)  Accordingly, the ALJ determined that Plaintiff satisfied step one.  (*Id.*)

At step two, the ALJ found that Plaintiff suffers from the following severe impairments: (1) affective disorder, (2) personality disorder, (3) history of substance addiction disorder, (4) history of seizure disorder, and (5) obesity.  (*Id.*)  Thus, with regard to Plaintiff's listed severe impairments, the ALJ found that Plaintiff satisfied step

1    two.  (*Id.*)  At step three, the ALJ found that Plaintiff does not have an impairment or

2    combination of impairments that meets or medically equals one of the listed impairments.

3    (*Id.*)  The ALJ, therefore, proceeded to step four.  (*Id.*)

4          Steps four and five require the ALJ to determine how the claimant's impairments

5    affect his or her ability to work.  To make this determination, the ALJ formulates the

6    claimant's RFC.  An RFC is "the most [the claimant] can still do despite [his or her]

7    limitations."  20 C.F.R. § 404.1545(a)(1).  An RFC "is used at step four of the sequential

8    evaluation process to determine whether an individual is able to do past relevant work

9    and at step five to determine whether an individual is able to do other work, considering

10   his or her age, education, and work experience."  Social Security Ruling ("SSR") 96-8p.

11   The ALJ found Plaintiff has the residual functional capacity to perform:

12         A full range of work at all exertional levels but with the following limitations: the

13         claimant is able to sustain simple, repetitive tasks.  The claimant has a moderate

14         limitation in her ability to deal with coworkers and the general public and,

15         therefore, the claimant should have no more than brief, intermittent and superficial

16         contact with coworkers, supervisors and the general public.  The claimant is able to

17         climb ladders, ropes and scaffolds occasionally.  The claimant should avoid even

18         moderate exposure to hazardous machinery and unprotected heights.  (*Id.* at 27-

19         28.)

20         In making this determination, the ALJ considered all symptoms and the extent to

21   which those symptoms could reasonably be accepted as consistent with the objective

22   medical evidence and other evidence.  (*Id.* at 28.)  The ALJ also considered opinion

23   evidence.  (*Id.* at 31.)  The ALJ explained that he gave "substantial weight" to the opinion

24   of S. Khan, M.D., a state agency medical consultant who opined that Plaintiff "retained

25   the ability to perform work in a manner consistent with the residual functional capacity."

26   (*Id.*)  The ALJ noted that Dr. Khan was able to review the Plaintiff's "medical evidence

27   of record and is familiar with Social Security Administration rules and regulations as they

28   pertain to disability," and "his opinion is very consistent with the medical evidence of

1  record that documents that the claimant responds well to medication, when compliant,

2  and has a tendency to exaggerate her symptoms." (*Id.* at 31.)

3         The ALJ gave "appropriate weight" to the opinions of Doctor Bagner and Doctor

4  Rosa, noting that "[b]oth were able to personally evaluate the claimant and administer

5  several tests to the claimant designed to assess [her] level of functioning." (*Id.* at 31.)

6  The ALJ took particular notice of Doctor Rosa's "observations that the claimant's

7  performance on the assessments indicated that the claimant was putting forth suboptimal

8  efforts, especially when compared to the claimant's ability to recall specific and

9  exhaustive details about her impairments." (*Id.*) The ALJ noted that such observations

10 were "consistent with those contained in numerous treatment records" which "strongly

11 suggest a tendency to exaggerate symptoms and/or seek particular medications or

12 housing." (*Id.*)

13        The ALJ gave "reduced weight" to the allegations and testimony of Plaintiff with

14 respect to the extent to which her impairments preclude performance of all work. (*Id.*)

15 The ALJ noted that Plaintiff had been assigned low GAF scores by some mental health

16 providers, which were not consistent with the GAF scores assigned by the hospitals

17 Plaintiff visited, or Plaintiff's "presentation during her hospital stays or her consultative

18 examinations." (*Id.* at 31.)

19        Based on Plaintiff's age, education, work experience and residual functional

20 capacity, the ALJ found that there are jobs that exist in significant numbers in the

21 national economy that Plaintiff can perform. (*Id.*) He found that Plaintiff's ability to

22 perform work at all exertional levels was compromised by nonexertional limitations. (*Id.*

23 at 32.) To determine the extent to which these limitations eroded the occupational base

24 of unskilled work at all exertional levels, the ALJ relied on information provided by the

25 Vocational Expert to conclude that Plaintiff is capable of making a successful adjustment

26 to other work that exists in significant numbers in the national economy, and is, therefore,

27 not disabled. (*Id.*)

28        On June 23, 2014, Plaintiff requested review of the ALJ's decision. (*Id.* at 20.) On

September 15, 2014, the Office of Disability Adjudication and Review denied the request for review of the Administrative Law Judge's decision. (*Id.* at 1-7.)

## IV.  SCOPE OF REVIEW

Section 205(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of a final agency decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited.  *See* 42 U.S.C.A. § 405(g).  This Court has jurisdiction to enter a judgment affirming, modifying, or reversing the Commissioner's decision.  *See* 42 U.S.C.A. § 405(g); 20 C.F.R. § 404.900(a)(5).  The matter may also be remanded to the Social Security Administration for further proceedings.  *Id.*

The Commissioner's decision must be affirmed upon review if it is: (1) supported by "substantial evidence" and (2) based on proper legal standards.  *Uklov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005).  If the Court, however, determines that the ALJ's findings are based on legal error or are not supported by substantial evidence, the Court may reject the findings and set aside the decision to deny benefits.  *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001).  Substantial evidence is more than a scintilla but less than a preponderance.  *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003).  It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion."  *Id.*; *see also Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (finding substantial evidence in the record despite the ALJ's failure to discuss every piece of evidence).  "Where evidence is susceptible to more than one rational interpretation," the ALJ's conclusion must be upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  *See Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001).  Nevertheless, the Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

## V.  DISCUSSION

Plaintiff challenges the ALJ's denial of her disability application for five reasons:

1.  The ALJ's determination of Plaintiff's RFC is not supported by substantial evidence from the record.  (ECF No. 21-1 at 7.)

2.  The ALJ's credibility determination is not supported by substantial evidence. (ECF No. 21-1 at 11)

3.  The ALJ's duty to fully and fairly develop the record required him to contact Dr. Bhansali at Imperial County Behavioral Health Services to resolve purported ambiguities in the record regarding Plaintiff's functioning and ability to work. (ECF No. 21-1 at 17-18.)

4.  The representative occupations the Vocational Expert testified Plaintiff could perform were inconsistent with the explanations of those occupations in the Dictionary of Occupational Titles (DOT).  (ECF No. 21-1 at 19.), and

5.  The Vocational Expert's hypotheticals were incomplete because the ALJ erred in formulating the RFC and credibility determination.  (ECF No. 21-1 at 21.)

The Court will review each argument in turn.

**A. Is the RFC Supported by Substantial Evidence?**

**1.  Parties' Arguments**

Plaintiff asserts in her motion for summary judgment that the ALJ's determination of Plaintiff's RFC is not supported by substantial evidence from the record.  (ECF No. 21-1 at 7.)  Specifically, Plaintiff asserts that the ALJ failed to reconcile his RFC finding with the opinion of consultive examiner, Dr. Rosa.  (*Id.* at 8:21-9:5.)  Plaintiff argues the RFC determination that Plaintiff can "sustain simple, repetitive tasks," (AR at 27) is inconsistent with their interpretation of Dr. Rosa's opinion that Plaintiff cannot maintain adequate concentration and pace, or carry out simple or complex instructions on a sustained basis.  (*Id.* at 594.)

Defendants disagree with Plaintiff's characterization of the RFC, and argue it is consistent with Dr. Rosa's opinion on Plaintiff's abilities and supported by substantial evidence in the record.  (ECF No. 22-1 at 10-11.)

### 2. Relevant Law

A reviewing court will reverse the ALJ's decision only if "it is based upon legal error or is not supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n. 1 (9th Cir. 2005) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citation omitted). "If the record would support more than one rational interpretation, we defer to the ALJ's decision." *Bayliss*, 427 F.3d at 1214 n. 1 (citation omitted).

### 3. Analysis

The Court has reviewed the administrative record and recommends a finding that the ALJ's determination of Plaintiff's RFC is supported by substantial evidence. Specifically, the ALJ's finding that Plaintiff "is able to sustain simple, repetitive tasks" is consistent with Dr. Rosa's findings that Plaintiff "retained the ability to understand, remember and carry out short, simplistic instructions without difficulty (AR 594), and her "attention and concentration were *mildly* diminished." (*Id.* at 591)(emphasis added). Moreover, Dr. Rosa's conclusions that Plaintiff would have a "*moderate* inability to maintain adequate concentration and pace during an 8 hour workday" and a "*moderate* inability to carry out simple or complex instructions on a sustained basis," still implies that Plaintiff maintains *some* ability in those areas. (*Id.* at 594)(emphasis added).

The ALJ's conclusion that Plaintiff is "able to sustain simple, repetitive tasks" is also consistent with Dr. Bagner's findings that Plaintiff would have no limitation in her ability to follow simple oral and written instructions (*id.* at 598) and Dr. Khan's findings that Plaintiff was "not significantly limited" in her ability to "carry out very short and simple instructions." (*Id.* at 93.) Notably, Dr. Khan, to whom the ALJ afforded "substantial weight," (*Id.* at 31) also found that Plaintiff was "moderately limited" in her ability to maintain attention and concentration for extended periods. (*Id.* at 93.) Nevertheless, Dr. Khan concluded that Plaintiff's condition was not disabling. (*Id.* at 96.)

Additionally, the ALJ specifically noted Dr. Rosa's observations "that the

claimant's performance on the assessments indicated that the claimant was putting forth suboptimal efforts, especially when compared to the claimant's ability to recall specific and exhaustive details about her impairments." (*Id.* at 31.)  The ALJ further noted that such observations "are consistent with those contained in numerous treatment records and strongly suggest a tendency to exaggerate symptoms and/or seek particular medications or housing." (*Id.* at 31.)  The evidence of possible exaggeration by Plaintiff, coupled with the opinions of Dr. Rosa, Dr. Bagner and Dr. Khan that Plaintiff could complete simple, repetitive tasks constitutes substantial evidence to support the ALJ's RFC determination.

### 4.  Conclusion

The Court recommends a finding that Plaintiff's RFC is consistent with Dr. Rosa's opinion on Plaintiff's abilities and is supported by substantial evidence in the record.

## B.  Is the Credibility Determination Supported by Substantial Evidence?

### 1.  Parties' Arguments

Plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence (ECF No. 21-1 at 11) because the ALJ failed to address the nature of Plaintiff's mental impairments, as well as social stressors such as her familial situation that influence her medication compliance. (*Id.* at 13.)  Additionally, Plaintiff contends that the ALJ's conclusion that Plaintiff is "social and normal from a mental health standpoint when sober and compliant with her medications," fails to acknowledge her anxiety and suicidal ideation when Plaintiff has been stabilized. (*Id.* at 13 citing AR 593-94, 2153-2168.)

Plaintiff also argues that the ALJ improperly relied on daily activities to support his credibility determination because Dr. Bagner found Plaintiff's daily activities to be moderately limited. (*Id.* at 13-14.)  Plaintiff took issue with the ALJ's demeanor towards Plaintiff during the preliminary hearing, categorizing it as "antagonistic," and suggesting this demeanor undermined the ALJ's ability to determine Plaintiff's credibility. (*Id.* at 16.)

In response, Defendants point to Plaintiff's poor effort on psychometric testing (ECF No. 22-1 at 7), and attempts to sabotage her discharge from voluntary hospitalizations as supporting the ALJ's credibility determination of Plaintiff.  (*Id.*) Because the record contains evidence of possible malingering, Defendants argue that the ALJ was not required to provide additional reasons for finding Plaintiff not credible. (*Id.*)

## 2.  Relevant Law

The ALJ has a "well-settled role as the judge of credibility." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).  Accordingly, the ALJ's assessment of a claimant's credibility and pain severity should be given "great weight." *Dominguez v. Colvin*, 927 F. Supp. 2d 846, 865 (9th Cir. 2003) (citing *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986)).

The Ninth Circuit has established a two-step analysis for the ALJ to evaluate the credibility of a claimant's testimony regarding subjective pain and impairments.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2008) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether Plaintiff presented objective medical evidence of an impairment or impairments that could reasonably be expected to produce the pain or other alleged symptoms.  *Id.*  Second, if Plaintiff satisfies the first step and there is no affirmative evidence of malingering,[2] the ALJ may reject Plaintiff's testimony only if he provides "specific, clear and convincing reasons" for doing so.  *Id.*; *see also Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).  These reasons must be "sufficiently specific

---

[2] It is still an open question in the Ninth Circuit whether the ALJ must make a specific finding of malingering or whether a lesser standard of "mere evidence of malingering" in the record is sufficient to avert application of the clear and convincing standard.  *Ghanim v. Colvin*, 763 F.3d 1154, 1163 n.9, 207 Soc. Sec. Rep. Serv. 404, Unempl. Ins. Rep. (CCH) P 15285C (9th Cir. 2014).  Although there is evidence of malingering in the record, the ALJ did not make a specific finding.  Accordingly, this Court will err on the side of caution and apply the clear and convincing standard to the ALJ's credibility determination.

14cv02741-LAB (BGS)

1    to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's

2    testimony." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n. 3 (9th Cir. 2010)

3    (citation omitted).

4        In weighing the credibility of Plaintiff's testimony, the ALJ may use "ordinary

5    techniques of credibility determination." *Id.* The ALJ may consider the "inconsistencies

6    either in his testimony or between his testimony and his conduct, his daily activities, his

7    work records, and testimony from physicians and third parties concerning the nature,

8    severity and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*,

9    119 F.3d 789, 792 (9th Cir. 1997).

10       **3. Analysis**

11       The ALJ found that Plaintiff's medically determinable impairments could

12   reasonably be expected to cause the alleged symptoms, but also found that Plaintiff's

13   statements concerning the "intensity, persistence and limiting effects of [her] symptoms

14   [were] not entirely credible." (ECF No. 16-2 at 28.) Because the ALJ did not make an

15   affirmative finding that Plaintiff was malingering, the remaining issue is whether the ALJ

16   provided "specific, clear and convincing reasons" for rejecting Plaintiff's subjective

17   complaint testimony. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).

18       The Court finds that the ALJ's decision properly set forth "specific, clear and

19   convincing reasons" supported by substantial evidence in the record for rejecting

20   Plaintiff's subjective complaint testimony regarding the intensity, persistence and

21   limiting effects of her symptoms. (AR at 28.) In finding Plaintiff' testimony not

22   credible, the ALJ noted the strong indications in the record that claimant is, at the least,

23   exaggerating her symptoms in an attempt to secure medication or housing (or both) or

24   attempting to malinger. (*Id.* at 31.)

25       In support of this determination, the ALJ noted Dr. Rosa's conclusion "that the

26   results [of tests designed to assess Plaintiff's level of intellectual functioning] were an

27   underestimation of [Plaintiff's] ability due to the dichotomy between the claimant's

28   ability to fill out a pre-printed questionnaire in detail and give her a very elaborate history

of her alleged mental illness." (*Id.* at 29.)  The ALJ also relied on Plaintiff's medical history which includes a number of sources describing Plaintiff as exaggerating or malingering.

For example, notes from Plaintiff's hospital stay in September of 2013, describe Plaintiff as "resistant to discharge" and "attempting to 'sabotage' attempts to discharge her" and even state that Plaintiff might be "malingering." (*Id.* at 30.)  The ALJ noted that "similar observations were made in October of 2013, when [Plaintiff] responded well to treatment and exhibited marked improvement, but tended to exaggerate her symptoms when approached about being discharged." (*Id.*)  Treatment notes from November 2013 describe Plaintiff as "extremely psychosomatic, manipulative, [and] demanding." (*Id.*)  Despite being discharged that day, Plaintiff tried to be admitted to another facility, which again noted her to be "manipulative." (*Id.*)  A few days later, treatment notes reference possible malingering and drug seeking behavior.  (*Id.*)  In December of 2013, Plaintiff presented to a different hospital, which observed her to be "pleasant and social" during her evaluation and treatment, but when Plaintiff was set to be released, she "became tearful and emotional." (*Id.*)

The ALJ gave "reduced weight to the allegations and testimony of the claimant with respect to the extent to which her impairments preclude the performance of all work." (*Id.*)  The ALJ noted the "strong indications in the record that [Plaintiff] is, at the least, exaggerating her symptoms in an attempt to secure medications or housing (or both).  At worst, [Plaintiff] might be attempting to malinger." (*Id.*)  The ALJ sufficiently supported his conclusion that Plaintiff might be exaggerating her symptoms with "specific, clear and convincing reasons."  Moreover, the Court is not persuaded that the ALJ's alleged demeanor toward Plaintiff resulted in any bias, as the Court has found the ALJ's credibility determination is supported by substantial evidence.

### 4.  Conclusion

The Court recommends a finding that there is sufficient basis for the ALJ's conclusion to discredit Plaintiff's testimony.  The ALJ's decision properly set forth

1  "specific, clear and convincing" reasons supported by substantial evidence in the record

2  to properly discredit Plaintiff's subjective complaint testimony.

3  **C. Did the ALJ fully and fairly develop the record?**

4  **1. Parties' Arguments**

5  Plaintiff argues that the ALJ's duty to fully and fairly develop the record required

6  him to contact Dr. Bhansali at Imperial County Behavioral Health Services to request a

7  medical source statement to resolve purported ambiguities in the record regarding

8  Plaintiff's functioning and ability to work.[3]  (ECF No. 21-1 at 17-18.)  Defendants state

9  that the ALJ sufficiently developed the record and had no duty to seek out additional

10  information from Dr. Bhansali because the record was neither ambiguous, nor

11  inadequate.  (ECF No. 22-1 at 12.)

12  **2. Relevant Law**

13  "The Commissioner is required to develop the claimant's complete medical record

14  for at least the 12 months preceding the month in which the claimant filed their disability

15  application unless there is reason to believe the development of an earlier period is

16  necessary to determine the claimant's disability status."  *Avidano v. Astrue*, No. C–09–

17  3274 RMW, 2012 WL 1110019, at *4 (N.D. Cal. Mar. 31, 2012) (citing 20 C.F.R. §

18  416.912(d)).  "In evaluating whether the ALJ fulfilled his duty to develop the record, the

19  Ninth Circuit has held that an ALJ 'has a special duty to fully and fairly develop the

20  record and to assure that the claimant's interests are considered.'"  *Id.* (quoting *Brown v.*

21  *Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)).

22  "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to

23  allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an

---

[3] The Social Security regulations set out specific guidelines for how much weight should be accorded to treating physicians, consultive examining physicians, and consultive non-examining physicians.  *See* 20 C.F.R. § 404.1527.  Here, however, Plaintiff focuses her argument on the ALJ's duty to develop the record by seeking a medical source statement from Dr. Bhansali, not on how much weight should be given to a treating physician's opinion.  Plaintiff separately argues about the weight accorded to examining physician Dr. Rosa, the analysis of which is addressed above in section A.

appropriate inquiry.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citing *Smolen v. Chater*, 80 F.3d at 1288). The ALJ may satisfy this duty "by subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Id.* (citing *Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998); *Smolen*, 80 F.3d at 1288). The ALJ's duty to contact a treating physician arises when the evidence received from that physician is inadequate to determine disability, contains a conflict, or is ambiguous. *See Tonapetyan*, 242 F.3d at 1150–51.

One aspect of the ALJ's duty to develop the record is the obligation to request that all acceptable medical sources provide a statement about what a claimant can still do despite her impairments. 20 C.F.R. § 404.1513(b)(6). However, "the lack of the medical source statement will not make the report incomplete." 20 C.F.R. § 404.1513(b)(6). The ALJ has a duty to request medical source statements about what the claimant can still do when the submitted opinions are not sufficiently clear and raise an ambiguity. *Rondinelli v. Astrue*, No. 09CV31 WQH RBB, 2010 WL 3464947, at *12 (S.D. Cal. May 20, 2010) report and recommendation adopted, No. 09CV31 WQH RBB, 2010 WL 3464878 (S.D. Cal. Aug. 30, 2010) *citing Lewis v. Comm'r Soc. Sec. Admin.*, 293 F. App'x 495, 496 (9th Cir. 2008). Moreover, in order to show that an ALJ's decision should be reversed and remanded due to a failure to develop the administrative record, Plaintiff must demonstrate prejudice or unfairness. *Cruz v. Schweiker*, 645 F.2d 812, 814 (9th Cir. 1981).

### 3. Analysis

As discussed above, the ALJ properly based his determination of the type of work Plaintiff could perform on the opinions of the other three doctors of record. The lack of a medical source statement from Dr. Bhansali did not render the 2,200 page record ambiguous or inadequate. 20 C.F.R. § 404.1513(b)(6); *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001) (explaining that the ALJ's duty to develop the record is triggered if the record is ambiguous or undeveloped). Moreover, there is no indication

1  that a medical source statement from Dr. Bhansali would have altered the ALJ's

2  assessment of Plaintiff's residual functional capacity because notes from Dr. Bhansali's

3  treatment of Plaintiff are consistent with other records that the ALJ relied upon in making

4  his determination regarding Plaintiff's disability status.

5  For example, medical records from Plaintiff's visit to Dr. Bhansali on February 21,

6  2014 indicate that she was reporting no depression, no anxiety attacks with medication

7  support, a stable mood, and that her sleep was "good."  (AR 2159.)  Plaintiff's Motion

8  points to the more recent report from her visit to Dr. Bhansali on April 15, 2015, which

9  describes Plaintiff as having anxiety attacks six times a week (*id.* at 2153), but that report

10  also states that Plaintiff was worried about an upcoming hearing for child support, and

11  that she was "doing good with medication support," had no feelings of depression, no

12  mood swings, no anger, no irritability and her sleep is "good."  (*Id.* at 2153.)

13  This medical evidence is consistent with other treatment records that indicate

14  Plaintiff has a strong reaction to life events, but when she is compliant with her

15  mediation, she stabilizes.  For example, Plaintiff admitted herself in McKay Dee Hospital

16  on March 19, 2013, with suicidal ideations, and upon restarting and regulating her

17  medication, she was determined to be psychiatrically and medically stable and was

18  discharged.  (*Id.* at 648-55)  Another example is when Plaintiff went to Sharp Grossmont

19  Behavioral Health on December 1, 2013 due of suicidal ideations because "her boyfriend

20  [was] cheating on her."  (*Id.* at 1676).  Upon discharge on December 10, 2013, Plaintiff

21  stated that she no longer felt suicidal because she "had [her] meds adjusted."  (*Id.* at

22  1683.)

23  Although the ALJ did not have a medical source statement from Dr. Bhansali, he

24  did have access to the medical records and treatment notes from Dr. Bhansali and the

25  other medical staff at Imperial County Behavioral Health Services.[4]  (*See id.* at 2151-

26  _____

27  [4] Notably, the ALJ did not have these records during the hearing and kept the record open so these
   medical records could be supplemented.  (*See* AR 64 "As soon as he [Plaintiff's attorney] and I are
28  satisfied that I have all the evidence that will help me understand this case, I'll close the record.")

26

14cv02741-LAB (BGS)

2168.)  There is nothing in the record to suggest that the ALJ failed to take these medical records into account in his analysis of Plaintiff's claim.  Nor does the record suggest that any additional medical source statement from Dr. Bhansali would have influenced the ALJ to make a different determination regarding Plaintiff's disability status.

Additionally, Plaintiff's medical records do not indicate that Dr. Bhansali performed any tests on Plaintiff other than a mental status exam during each visit (*id.* at 2154, 2157, and 2162) and a review of Plaintiff's blood work indicating she had abnormal lipids.  (*Id.* at 2154, 2158.)  The bulk of information Dr. Bhansali received was from Plaintiff's own account, as each status report states "signs and symptoms as described by patient (subjective)."  (*See id.* at 2153 and 2159.)  Moreover, Dr. Bhansali's most recent notes from April 15, 2014 state that he had not yet verified Plaintiff's diagnosis or medications from her previous provider records.  (*Id.* at 2154.)  Because Dr. Bhansali's opinion would be based on Plaintiff's self-reports and not on clinical data, it would not receive controlling weight.  *See Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) citing *Tommasetti*, 533 F.3d at 1041 (If a treating provider's opinions are based "to a large extent" on an applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not credible, the ALJ may discount the treating provider's opinion.)

Therefore, not only was the ALJ not required to seek a medical source statement from Dr. Bhansali, the weight of any such opinion would have been negligible as it would have been based on Plaintiff's self-reports when the ALJ already determined her not to be credible.  Thus, Plaintiff has not demonstrated prejudice or unfairness.  *See Cruz v. Schweiker*, 645 F.2d 812, 814 (9th Cir. 1981) (holding that a claimant must "demonstrate prejudice or unfairness in the proceedings" to warrant reversal for an ALJ's failure to develop the record).

### 4. Conclusion

The Court finds that the ALJ's duty to fully and fairly develop the record did not require him to contact Dr. Bhansali at Imperial County Behavioral Health Services

1  because there were no ambiguities in the record regarding Plaintiff's functioning and

2  ability to work.

3  **D. Is the Step 5 Determination Supported by Substantial Evidence?**

4  **1. ALJ Failed to Reconcile conflict between VE testimony and the Dictionary**

5  **of Occupational Titles**

6  **a. Parties' Arguments**

7  Plaintiff argues that the representative occupations the VE testified Plaintiff could

8  perform were inconsistent with the explanations of those occupations in the Dictionary of

9  Occupational Titles (DOT).  (ECF No. 21-1 at 19.)  Specifically, Plaintiff argues that the

10  VE's testimony that Plaintiff could perform the requirements of a janitor/cleaner, which

11  requires an individual to render personal assistance to patrons, conflicts with an RFC

12  which limits Plaintiff to "simple, repetitive tasks" and "no more than brief, intermittent

13  and superficial contact with coworkers, supervisors and the general public."  (ECF No.

14  21-2 at 20 citing AR 27.)  Additionally, Plaintiff contends that the VE's testimony that

15  Plaintiff could perform the requirements of a stock clerk, which requires an individual to

16  distribute items to production works or assembly line and requires Level 02 Reasoning

17  Development, is also in conflict with Plaintiff's given RFC.  (*See* ECF No. 21-2 at 20

18  *citing* DOT # 922.687-058.)

19  Defendant argues that Plaintiff's mechanical comparison of the RFC language and

20  the DOT language is misguided because equating the Social Security regulations use of

21  the term "simple" with its use in the DOT would imply that all jobs with a reasoning

22  level of two or higher are encapsulated within the regulations' use of the word "detail."

23  **b. Relevant Law**

24  The Ninth Circuit Court of Appeals has explained that "[t]he occupational

25  evidence provided by a [VE] should generally be consistent with the occupational

26  information supplied by the DOT."  *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219,

27  1233 (9th Cir. 2009). "[A]n ALJ may rely on a [VE]'s testimony regarding the

28  requirements of a particular job" after first inquiring whether the testimony conflicts with

the DOT. *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). "When there is a conflict between the VE evidence and the DOT, it is a duty of the ALJ to inquire on the record as to the reason for the inconsistency before relying on the VE's evidence." *Bray*, 554 F.3d at 1233. This duty only arises when there is "an apparent unresolved conflict between [the VE's] evidence and the DOT." *Policy Interpretation Ruling: Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P, 2000 WL 1898704, *2 (S.S.A. Dec. 4, 2000).

### c. Analysis

   i. Plaintiff's RFC limiting her to "no more than brief, intermittent and superficial contact with coworkers, supervisors and the general public" is not inconsistent with the VE's proposed occupations.

Vocational Expert ("VE"), Kathleen McAlpine, testified that Plaintiff could perform the requirements of the representative occupation of janitor/cleaner, DOT # 323.687-014, which requires an individual to render personal assistance to patrons. Dictionary of Occupational Titles (4th Ed., rev. 1991). According to Plaintiff, this requirement specifically conflict with the RFC limiting Plaintiff to "no more than brief, intermittent and superficial contact with coworkers, supervisors and the general public." (AR 27.) First, the DOT makes clear that this occupation can performed in "hotels, restaurants, clubs," which may or may not require contact with patrons. DOT # 323.687-014. Moreover, Plaintiff's RFC limits her to "brief, intermittent and superficial contact" with the general public. This does not mean she is precluded from *any* contact with the general public. *See also Ackley v. Astrue*, No. CV 10-185-SI, 2011 WL 4369119, at *8 (D. Or. Sept. 19, 2011)(finding that an RFC requiring "minimal interaction" is not the same as no interaction, and is not inconsistent with the occupational requirements for a janitor; *Roosma v. Colvin*, No. 2:15-CV-0002-HRH, 2015 WL 5934839, at *9 (D. Ariz. Oct. 13, 2015)(noting that the job of cleaner/housekeeper, DOT No. 323.687-014, can be performed in any number of commercial establishments, some of which would not

require contact with patrons).  Accordingly, this Court rejects Plaintiff's contention that an RFC limiting her to "brief, intermittent and superficial contact" with the general public is inconsistent with the VE's testimony that Plaintiff could perform the representative occupation of janitor/cleaner.

> ii.  <u>Plaintiff's RFC limiting her to "simple, repetitive tasks" does not preclude her from doing a job that requires a reasoning level of 2</u>

The VE also proposed the occupation of stock clerk, DOT # 922.687-058, which requires an individual to distribute items to production workers or assembly line and requires Level 02 reasoning Development which entails applying commonsense understanding to carry out detailed but uninvolved written or oral instructions and dealing with problems involving a few concrete variables in or from standardized situations.  *Id.* According to Plaintiff, this requirement specifically conflicts with the RFC limiting her to "simple, repetitive tasks."  (AR 27.)

Plaintiff focuses on the fact that the DOT description for a reasoning level of 2 uses the word "detailed."  Essentially, Plaintiff seeks to equate the DOT's use of the word "detailed" with the Social Security regulations' use of the word "detailed instructions" in formulating a claimant's mental RFC.  The Court is not convinced that such a neat, one-to-one parallel exists between the two.

The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions.  20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3)("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks").  The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking . . . apprehend the most abstruse classes of concepts" at level six).  DOT at 1010–1011.  To equate the Social Security regulations use of the term

1   "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning

2   level of two or higher are encapsulated within the regulations' use of the word "detail."

3           Even more problematic for Plaintiff's position is that she ignores the qualifier the

4   DOT places on the term "detailed" as also being "uninvolved."  This qualifier certainly

5   calls into question any attempt to equate the Social Security regulations' use of the term

6   "detailed" with the DOT's use of that term in the reasoning levels.  Instead of simply

7   seeking to equate the two scales based on the coincidence that they employ the same

8   word choice, a much more careful analysis is required in comparing Plaintiff's RFC with

9   the DOT's reasoning scale.

10          The ALJ found that Plaintiff could perform not just simple tasks but also ones that

11  had some element of repetitiveness to them.  While reasoning on level two notes the

12  worker must be able to follow "detailed" instructions, it also (as previously stated)

13  downplayed the rigorousness of those instructions by labeling them as being

14  "uninvolved."  Other courts have rejected the assertion that a reasoning level of two

15  precludes "simple repetitive work."  *See, e.g.*, *Hackett v. Barnhart*, 395 F.3d 1168, 1176

16  (10th Cir. 2005)(holding that "level-two reasoning appears more consistent with

17  Plaintiff's RFC" to "simple and routine work tasks"); *Renfrow v. Astrue*, 496 F.3d 918,

18  921 (8th Cir. 2007); *Money v. Barnhart*, 91 Fed. Appx. 210, 214, 2004 WL 362291, at *3

19  (3rd Cir. 2004)("Working at reasoning level 2 would not contradict the mandate that her

20  work be simple, routine and repetitive"); s*ee also Koontz v.* Astrue, 2010 WL 3339388 *

21  9 (S.D. Cal. July 26, 2010) *citing Perry v. Astrue*, 2009 WL 435123, at *12 (S.D. Cal.

22  Feb. 19, 2009) (finding that jobs requiring level two reasoning were not inconsistent with

23  Plaintiff's limitation to simple repetitive tasks); *Rochon v. Astrue*, No. 09-CV-373 H

24  (POR), 2009 WL 4260258, at *6 (S.D. Cal. Nov. 24, 2009)(finding that the vocational

25  expert's testimony requiring a Reasoning Level of either 1 or 2 was consistent with the

26  Dictionary of Occupational Titles and Plaintiff's identified residual functional capacity

27  for "simple, repetitive work.")

28          Based on the above cases, and its own analysis, this Court rejects Plaintiff's

contention that an RFC limiting her to "simple, repetitive tasks" is inconsistent with the VE's testimony that Plaintiff could perform occupations that require a reasoning level of two.

### d.  Conclusion

Therefore, the Court finds that the representative occupations the VE testified Plaintiff could perform were consistent with the explanations of those occupations in the Dictionary of Occupational Titles.

### 2.  ALJ Relied on VE testimony in response to an incomplete hypothetical

#### a.  Parties' Arguments

The Plaintiff argues that the hypotheticals were incomplete because the ALJ erred in formulating the RFC and credibility determination.  (ECF No. 21-1 at 21.)  Defendant characterizes Plaintiff's position as restating prior arguments that the ALJ improperly discounted certain evidence.  (ECF No. 22-1 at 14-15.)  Moreover, Defendant argues, the ALJ's residual functional capacity finding reflected a proper clarification of Plaintiff's limitations, hence the step five finding was free of legal error.  (*Id.* at 15.)

#### b.  Relevant Law

The ALJ's hypothetical must be based on medical assumptions supported by substantial evidence in the record which reflect all of a claimant's limitations.  *Osenbrook v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001).  The hypothetical should be "accurate, detailed, and supported by the medical record."  *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).

#### c.  Analysis

Plaintiff has failed to establish that the hypothetical posed to the vocational expert was incomplete.  Plaintiff's argument is expressly premised on what Plaintiff contends were errors made by the ALJ in determining Plaintiff's limitations, none of which are persuasive, as recommended with detailed analysis above.  (*See* section B regarding this Court's analysis on the ALJ's credibility determination and section A regarding the ALJ's RFC determination.)  The ALJ's hypothetical was properly tailored to the

limitations the ALJ found were applicable to Plaintiff and supported by the record.   His reliance on the vocational expert's resulting testimony was not error.  *See Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989) ("[T]he ALJ is 'free to accept or reject these restrictions . . . as long as they are supported by substantial evidence.' ") (quoting *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1986)).

### d.  Conclusion

Because the ALJ did not err in formulating Plaintiff's RFC or her credibility determination, the Court finds that the hypotheticals used by the ALJ were complete.

## VI.    CONCLUSION

Having reviewed the matter, the undersigned Magistrate Judge recommends that Plaintiff's motion for summary judgment be **DENIED** and that Commissioner's cross-motion for summary judgment be **GRANTED**.  This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than **<u>January 19, 2016</u>**, any party to this action may file written objections with the Court and serve a copy to all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **<u>February 2, 2016</u>**.

Dated:  January 4, 2016

Hon. Bernard G. Skomal
United States Magistrate Judge